FILED

2007 Jan-30  AM 10:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **GEORGE ADAMS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **CASE NO. CV 02-B-2610-S** |
| | } | |
| **ALLSTATE INSURANCE** | } | |
| **COMPANY; BRAD RANKIN,** | } | |
| | } | |
| **Defendants.** | } | |


## MEMORANDUM OPINION

This case is currently before the court on defendant's Motion for Summary

Judgment, (doc. 44).[1]  Plaintiff George Adams ("Adams") has sued Allstate Insurance Co.

("Allstate"), alleging discrimination under the Alabama Age Discrimination in

Employment Act ("AADEA"), breach of contract, intentional interference with business

relations, and conspiracy.  (Doc. 1.)  Upon consideration of the record, the submission of

the parties, the arguments of counsel, and the relevant law, the court is of the opinion that

defendant's Motion for Summary Judgment is due to be granted as to all of plaintiff's

claims.

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each
document as it is filed in the court's record.

**FACTS**[2]

On January 1, 2000, Adams entered into an R3001S Exclusive Agency Agreement

("the R3001S Agreement") with Allstate.  (Doc. 45, ¶5.)  Under the R3001S Agreement,

Adams, as an individual, was the party to the contract.  (*Id.*)  On February 26, 2001,

Adams signed an R3001C Agreement ("the R3001C Agreement" or "the Agreement") on

behalf of the George Adams Agency, Inc. ("the Adams Agency").  (Doc. 45, ¶6.)  Under

the R3001C Agreement, the Adams Agency, not Adams individually, became the party to

the agreement with Allstate, and the exclusive agent of Allstate.  (Doc. 45, ¶8.)  The

R3001C Agreement states that "[t]he relationship between the company and Agency and

its officers, directors, shareholders, members, employees, and other persons working in

connection with this Agreement, will be that of an independent contractor for all

purposes."  (Doc. 50, Ex. 6, part I.D.)

The R3001C Agreement provides the agent with an economic interest in the

customer accounts that the agent services.  (Doc. 45, ¶27.)  The Agreement provides the

agent the right to "transfer its entire economic interest in the business written under this

Agreement upon termination of this Agreement by selling the economic interest in the

business to an approved buyer."  (Doc. 50, Ex. 6, part XVI.B.)  However, no provision in

the Agreement gives the agent the right to purchase another agent's interest.  (Doc. 50,

---

[2]Although some statements of fact are disputed, the evidence is cited in the light most
favorable to plaintiffs, the non-moving parties, and all reasonable inferences from admissible
evidence are drawn in favor of plaintiffs. *See e.g., Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313,
1315 (11th Cir. 2000).

Ex. 6.)

          On February 22, 2001, Adams notified Allstate that he entered into an agreement

to purchase the economic interest in the Don Hunter Agency, Inc. ("the Hunter Agency").

(Doc. 45, ¶43.)  Don Hunter submitted an agency purchase approval request form to

Allstate on February 26, 2001.  (Doc. 45, ¶44.)  On March 28, 2001, a person identifying

herself as Barbara Randell, an Allstate Human Resources employee, informed Adams that

the economic interest in the Hunter Agency was not eligible for sale according to

company policy.  (Doc. 45, ¶46; doc. 49, ¶46.)  The Hunter Agency's R3001 Agreement

with Allstate required the Hunter Agency to operate under the R3001 Agreement for two

full years before it was eligible for sale.  (Doc. 45, ¶47.)  Consequently, the economic

interest in the Hunter Agency was not eligible for sale until November 1, 2001.  (Doc. 45,

¶48.)

          Following the May 9, 2001 announcement that Allstate was lifting the two-year

operating requirement for former employee agents seeking to sell their interest, Adams

asked Allstate if it would grant his request to purchase the economic interest in the Hunter

Agency.  (Doc. 45, ¶49.)  However, at that time, the purchase approval requirements had

changed.  (Doc. 49 at 25.)  As of April 1, 2001, Allstate required that purchasing agents

have their Series 6 and 63 licenses.  (Doc. 45, ¶50.)  Adams did not have these licenses.

(Doc. 45, ¶51.)

          On August 16, 2001, Adams wrote a letter to Brad Rankin, the Territorial Sales

3

Manager of Allstate, protesting the fact that he was not approved to purchase the economic interest in the Hunter Agency.  (Doc. 45, ¶52.)  The next day, August 17, 2001, William M. Dawson, a lawyer representing Adams, wrote Rankin demanding final approval or disapproval of the sale and threatening legal action.  (Doc. 45, ¶53.)

Adams testified that on August 17, 2001 he believed that he was the victim of discrimination.  (Doc. 46, Ex. C at 226.)  However, in an affidavit, Adams states: "I learned with proof that would support a lawsuit that I had been denied the purchase because of my age when I discovered the statement by Matt Phillips to John Eades that anyone who bought the Don Hunter Agency would be 'young' and a future 'superstar.'" (Doc. 50, Ex. 15, ¶2.)  Adams claims that he learned of this statement in April or May of 2002.  (Doc. 50, Ex. 15, ¶2.)  Hunter ultimately sold his interest to Jessup Standifer, a younger agent who possessed the Series 6 and 63 licenses.  (Doc. 45, ¶¶56, 58.)  Plaintiff filed this lawsuit on September 9, 2002.

## SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144,157 (1970).  Once

the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. V. Catrett*, 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* At 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor.  *See id.* At 255.  Nevertheless, the non-moving party need not be given the benefit of every inference but only of every reasonable inference.  *See Brown v. City of Clewiston*, 848 F. 2d 1534, 1540 n. 12 (11th Cir. 1988).

## DISCUSSION

### I.  Even if Plaintiff's AADEA Claim is Not Barred by the Statute of Limitations, Allstate is Entitled to Summary Judgment Because Plaintiff is an Independent Contractor

Allstate is entitled to summary judgment on plaintiff's AADEA claim.  Plaintiff filed his claim on September 9, 2002, more than 180 days after August 17, 2001, when he believed that Allstate was discriminating against him.  However, even if plaintiff's AADEA claim is not barred by the statute of limitations, the AADEA applies only to

5

employees, and plaintiff was an independent contractor.

**A. Timeliness**

In order to assert a timely claim under the AADEA, a plaintiff must either: 1) file an AADEA claim in a state court within 180 days from the occurrence of the alleged unlawful practice; or 2) file a charge with the EEOC within 180 days of the occurrence of the alleged unlawful practice, then file a claim in state court within 90 days after the EEOC's notice of dismissal of the charge.  *Byrd v. Dillard's, Inc.*, 892 So.2d 342, 346 (Ala. 2004).  The statute of limitations on an AADEA claim begins to run when the individual first learns of the alleged adverse action.  *See* Ala. Code § 25-1-29 (1975); *Dooley v. AutoNation USA Corp.*, 218 F.Supp.2d 1270, 1277 (N.D. Ala. 2002) ("because it is self-evident that the AADEA's purpose and prohibitions are like the [Age Discrimination in Employment Act] ('ADEA') . . . it follows that [the ADEA's] principles should govern in AADEA cases as well"); *Calhoun v. Federal Nat. Mortg. Ass'n*, 823 F.2d 451, 455-56 (11th Cir. 1987) (holding that under the ADEA the limitations period begins to run when plaintiff receives notice of the alleged illegal act).

In the present case, the adverse action was the decision not to approve the transfer of interest.  *See Calhoun v. Federal National Mortgage Association*, 823 F.2d 451, 455-56 (11th Cir. 1987) ("The alleged illegal acts here were the decision to terminate and the notice of that decision to [plaintiff]," not the actual termination).  Adams learned of Allstate's decision not to approve the transfer of interest on March 28, 2001.  (Doc. 46,

6

Ex. C at 191; doc. 46, Ex. I.)  As of August 17, 2001, Adams believed that Allstate had discriminated against him.  (Doc. 46, Ex. C at 226.)  However, Adams contends that the statute of limitations was suspended under the doctrine of equitable tolling until April or May of 2002, (doc. 50, Ex. 15, ¶2), when "he learned of Allstate's statement that it wanted a younger agent to purchase the Hunter Agency."  (Doc. 49 at 21.)  Consequently, he maintains that he timely filed his complaint on September 9, 2002.

Courts have permitted equitable tolling of the filing of ADEA cases under certain circumstances.[3]  *See Carter v. West Pub. Co.*, 225 F.3d 1258, 1265 (11th Cir. 2000) ("Under equitable tolling, Title VII's statute of limitations does not start to run until a plaintiff knew or reasonably should have known that she was discriminated against.").  However, those circumstances are limited.  *See Jones v. Dillard's, Inc.*, 331 F.3d 1259 (11th Cir. 2003).  Equitable tolling may apply in the ADEA context where the defendant wrongfully concealed facts, or "until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights."[4]  *Id.* at 1264 (quoting *Reeb v. Economic Opportunity Atlanta, Inc.*, 516 F.2d 924

---

[3]In *Jones v. Dillard's, Inc.*, an ADEA claim and an AADEA claim were before the Eleventh Circuit.  *Jones*, 331 F.3d 1259 (11th Cir. 2003).  The court applied the doctrine of equitable tolling to plaintiff's ADEA claim.  *Id.* at 1268.  The court also, after certifying the question to the Alabama Supreme Court, held that the AADEA incorporated the ADEA's statutes of limitations.  *Jones v. Dillard's, Inc.*, 368 F.3d 1278 (11th Cir. 2004).  However, the court did not indicate whether the ADEA's equitable tolling principles would apply to the AADEA's statute of limitations.  *Id.*

[4]Circuits other than the Eleventh have held that the statute of limitations is tolled only until a reasonable person would have known there was a possible violation of the ADEA.  For

(5th Cir. 1975)).  *See also Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518,

1531-32 (11th Cir. 1992); *Shiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380,

1389 (3d Cir. 1994)).  In other words, it is not until "[the plaintiff] ha[s] knowledge of

facts sufficient to support a prima facie case of age discrimination" that the statute of

limitations begins to run.  *Id.* at 1265 (citing *Sturniolo v. Chaffer, Eaton, Inc.*, 15 F.3d

1023, 1026 (11th Cir. 1994)).

Mere suspicion of age discrimination, without more, is insufficient to trigger the

statute of limitations.  *Id.* at 1266, 1268.  For example, in *Jones*, the plaintiff "had only a

mere suspicion of age discrimination until [the defendant] hired [a younger employee] in

her stead."  *Id.* at 1267.  "Until [the hiring of the younger employee], the record makes

clear that she only knew her position was being eliminated, that the company's reasons

---

example, the Seventh Circuit held:

> If a reasonable man in [the plaintiff's] position would not have known
> until July 7 that he had been fired in possible violation of the age
> discrimination act, he could appeal to the doctrine of equitable tolling to
> suspend the running of the statute of limitations for such time as was
> reasonably necessary to conduct the necessary inquiry. The qualification
> "possible" is important. If a plaintiff were entitled to have all the time he
> needed to be certain his rights had been violated, the statute of limitations
> would never run – for even after judgment, there is no certainty.

*Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990).  *See also Dring v.
McDonnell Douglas Corp.*, 58 F.3d 1323, 1329 (8th Cir. 1995) ("when a reasonable person in the
plaintiff's situation would not be expected to know of the existence of a possible ADEA
violation, this excusable ignorance may provide the basis for the proper invocation of the
doctrine of equitable tolling"); *Leong v. Potter*, 347 F.3d 1117 (9th Cir. 2003) ("If a reasonable
plaintiff would not have known of the existence of a possible claim within the limitations period,
then equitable tolling will serve to extend the statute of limitations . . . until the plaintiff can
gather what information he needs").  However, this court will apply the Eleventh Circuit's
precedent concerning equitable tolling to plaintiff's AADEA claims.

for the elimination seemed legitimate from what she knew about store sales, and that [the defendant] had suspiciously reinstated the [plaintiff's former position] in the store." *Id.* at 1267-68.  The court held that equitable tolling operated to save plaintiff's claims because she had no evidence supporting a cause of action until the hiring of a younger employee. *Id.* at 1268.  *See also Sturniolo*, 15 F.3d at 1026 (although the plaintiff suspected age discrimination at the time of his discharge, because mere suspicion is not sufficient to establish pretext, the statute of limitations did not begin to run until the plaintiff learned of his younger replacement); *Hargett v. Valley Federal Savings Bank*, 60 F.3d 754, 760-61 (11th Cir. 1995) ("A plaintiff, who is aware that he is being replaced in a position, which he believes he is able to perform, by a person outside the protected age group, knows enough to support filing a claim"); *Burlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1435 (the statute of limitations "might have been tolled if, in the period prior to the 180 days before filing the initial EEOC charge, [the plaintiff] had no reason to believe he was a victim of unlawful discrimination").

In the present case, three possible dates could be construed as triggering the statute of limitations: 1) March 28, 2001, when Allstate first informed Adams that it would not approve the transfer of interest; 2) August 17, 2001, when Adams testified that he believed he was the victim of discrimination; or 3) April or May of 2002, when plaintiff was told that Allstate said that it wanted a younger agent.  Only application of the third date would save plaintiff's claim.

Adams argues for application of the third date, contending that he lacked information about whether his injury was actionable until he learned of Allstate's alleged statement that it wanted a younger agent to purchase the Hunter Agency. (Doc. 49 at 20-21.) Adams's deposition testimony throws this contention into doubt. Adams testified that, as of August 17, 2001, he believed that his contract with Allstate had been breached, his legal rights were being violated, and that Allstate was discriminating against him on the basis of age. (Doc. 46, Ex. C at 214-15, 226.) Adams later submitted an affidavit, claiming that "[u]ntil [he] learned of Matt Phillips's statement [that Allstate wanted a younger agent], [he] had no proof of age discrimination." If, prior to learning of the alleged statement, Adams's belief was a "mere suspicion," the statute of limitations was tolled "until the facts supporting a cause of action became apparent or should have became apparent to a reasonably prudent person with concern for his or her rights."[5] *See Jones*, 331 F.3d at 1259. Adams's deposition testimony indicates that he firmly believed, rather than merely suspected, that Allstate discriminated against him. Therefore, the court is of the opinion that the statute of limitations began on August 17, 2001 at the latest, and

---

[5]The Eleventh Circuit has held that "[a] plaintiff, who is aware that he is being replaced in a position, which he believes he is able to perform, by a person outside the protected age group, knows enough to support filing a claim." *Hargett*, 60 F.3d at 760-61. In other words, the statute of limitations would begin at the time Adams knew that Allstate approved the transfer of interest to a younger agent. Adams, like the plaintiffs in *Jones* and *Sturniolo*, was aware that a younger agent obtained the book of business that he attempted to purchase. (Doc. 46, Ex. C at 225-26.) However, Adams testified that he does not remember when he learned that Allstate approved the transfer of interest to a younger agent. (*Id.*) Consequently, the court cannot use that date.

10

Adams's claim is therefore barred by the statute of limitations.  However, even if the claim is not barred, summary judgment is due to be granted because Adams was not Allstate's employee under the AADEA.

## B.  Independent Contractor

The AADEA prohibits employers from discriminating on the basis of age against their employees. Ala. Code § 25-1-22 (1975).  Coverage under the AADEA extends only to employees, not independent contractors.  *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502 (2d Cir.1994); *Cobb v. Sun Papers, Inc.*, 673 F.2d 337 (11th Cir.), *cert. denied*, 459 U.S. 874 (1982). Therefore, if Adams was an independent contractor, the AADEA does not apply, and Allstate's motion for summary judgment is due to be granted.

The Eleventh Circuit has adopted the "hybrid" test to guide courts determining whether an individual is an employee or an independent contractor.  *Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 340 (11th Cir.), *cert. denied*, 459 U.S. 874 (1982).  This test looks at the economic realities of the situation and the employer's right to control the means and manner of the worker's performance. *Oestman v. Nat'l Farmers Union Ins. Co.*, 958 F.2d 303, 305 (10th Cir.1992).  The hybrid test also considers the following common-law agency principles:

> (1) the kind of occupation, specifically whether the work is usually performed under the direction of a supervisor; (2) the skill required to perform the particular occupation; (3) whether the "employer" or the individual furnishes the equipment used and the place of work;

> (4) the length of time the individual has worked; (5) the method of payment, whether by time or by the job; (6) whether one or both parties have the right to terminate the relationship with or without notice; (7) whether leave or vacation is afforded; (8) whether the work is an integral part of the "employer's" business; (9) whether the individual accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Cobb*, 673 F.2d at 340.

Federal courts have consistently held that insurance agents are independent contractors.  *See, e.g., Butts v. Comm'r of Internal Revenue*, 49 F.3d 713 (11th Cir. 1995) (insurance agent was independent contractor for tax purposes even though agreement indicated that Allstate considered plaintiff to be an employee); *Oestman v. National Farmers Union Ins. Co.*, 958 F.2d 303 (10th Cir.1992) (insurance agent was independent contractor under the ADEA); *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377 (7th Cir.1991) (insurance agent was independent contractor under Title VII); *Schwieger v. Farm Bureau Ins. Co. of Neb.*, 207 F.3d 480 (8th Cir. 2000) (insurance agent was independent contractor under Title VII).  Adams has cited no contrary authority. Defendant, on the other hand, has cited a number of cases holding not just that insurance agents in general are independent contractors, but that Allstate Exclusive Agents are independent contractors.  *See, e.g., Lockett v. Allstate Ins. Co.*, 364 F.Supp.2d 1368, 1380 (M.D. Ga. 2005).  Analysis of plaintiff's relationship with defendant under the "hybrid test" leads the court to the same result.

### A.  Common Law Principles

The first factor looks at whether the plaintiff's work is the type that is usually performed under the direction of a supervisor.  Adams hired his own employees, supervised them, and set their pay and schedules.  (Doc. 45, ¶19.)  Adams also set his own hours, and was not required to keep a certain office schedule.  (*Id.* at ¶20.)  As in *Butts*, "Allstate in practice showed no pattern of supervision and control over the manner in which [plaintiff] performed in his profession."  *See Butts*, 49 F.3d at 713 (adopting as its own the opinion of the tax court in *Butts v. C.I.R.*, T.C. Memo. 1993-478, 1993 WL 410704 (Tax Court 1993)).  Consequently, the first factor weighs in favor of independent contractor status.

The "skill required to perform the particular occupation" also suggests that Adams was an independent contractor.  The sale of insurance is a specialized field, which requires training, skill, and a license.  *See, e.g., Weary v. Cochrane*, 377 F.3d 522, 527 (6th Cir. 2004) (citing  *Schwieger*, 207 F.3d at 485 (this factor "weigh[ed] heavily in favor of independent contractor status" where the insurance agent "considered herself an insurance professional," was licensed by Nebraska, and was subject to a code of professional ethics)).

The third factor looks at which party furnishes the equipment and place of work.  Adams purchased his own office, was solely responsible for the agency's expenses, and owns the furniture and equipment inside the office.  Allstate owns only the agency's telephone numbers, and provides such signs, manuals and other materials that it "deems

advisable." (Doc. 45 at 26; doc. 49 at 17, 19.)  *See Lockett*, 364 F.Supp.2d at 1375 ("even though Defendant owns the phone number used by the agency and provides some promotional and office materials, Plaintiff is responsible for providing the office space, equipment, products, and staff that maintain the agency").

In the present case, the length of time Adams has worked has little bearing on the analysis.  The relevant relationship with Allstate began in 2000 when he signed an agreement to be an independent contractor of Allstate.  (Doc. 49 at 1.)  *See Lockett*, 364 F.Supp.2d at 1374 ("because the twenty-five year employer/employee relationship was changed when Plaintiff agreed to become an independent contractor, and that relationship, especially in 2002, is relatively short in duration, this factor is not valuable in the analysis of Plaintiff's employment status").  Adams filed this action in 2002, two years after he signed the agreement designating him an independent contractor.

The fifth, sixth, and seventh factors also support the conclusion that Adams was an independent contractor.  He was paid on commission and was not guaranteed any minimum income.  *See John Cooper Produce, Inc. v. Paxton Nat'l Ins. Co.*, 774 F.2d 433 (11th Cir.1985) (payment by commission signaled independent contractor status).  Furthermore, under his agreement with Allstate, either the Adams Agency or Allstate has the right to unilaterally terminate the agreement at any time with or without cause upon giving 90 days of notice to the other.  *See Sica v. Equitable Life Assurance Soc'y of the U.S.*, 756 F.Supp. 539, 542 (S.D. Fla. 1990) (noting that equal ability to fire and resign

14

indicated independent contractor status).  Because Adams did not receive vacation or

other leave-related benefits from Allstate, the seventh factor also suggests independent

contractor status.

The eighth factor weighs in favor of employee status.  Adams sells insurance, and

the sale of insurance is clearly an integral part of Allstate's business.  *See Lockett*, 364

F.Supp.2d at 1375.

The final three factors indicate independent contractor status.  Adams did not

accumulate retirement benefits and paid his own social security taxes.  (Doc. 45, ¶¶15-

17.)  Finally, the parties intended to create an independent contractor relationship.  The

Allstate R3001C Agreement states:

> The relationship between the Company and Agency and its officers,
> directors, shareholders, members, employees, and other persons
> working in connection with this Agreement, will be that of an
> independent contractor for all purposes.

(Doc. 50, Ex. 6, part I.D.)  *See Lockett*, 364 F.Supp.2d at 1375 (citing *Bates v. Variable*

*Annuity Life Ins. Co.*, 200 F.Supp.2d 1375, 1379 (N.D. Ga.2002) (looking to terms of

contract to find insurance agent independent contractor for purposes of ADEA)); *Gordon*

*v. Birmingham News*, 1989 WL 222730 *2 (N.D. Ala. Jun. 27, 1989) (looking at

applicable paragraph of contract for clear intention of parties)).  Furthermore, Adams

testified that he has been an independent contractor since February 26, 2001.  (Doc. 45,

¶11.)

All but one factor weigh in favor of independent contractor status.  Therefore, the

15

common law principles provide strong support for the conclusion that Adams was an

independent contractor, not an employee.

## B. The Right to Control

Another important consideration is the hiring party's right to control the manner

and means by which a task is accomplished. *Nationwide Mut. Ins. Co. v. Darden*, 503

U.S. 318, 323 (1992).  "[W]here the contract of employment clearly denominates the

other party as an independent contractor, that relationship is presumed to be true unless

the evidence shows that the employer assumed such control." *Johns v. Jarrard*, 927 F.2d

551, 556 (11th Cir. 1991) (quoting *Bartlett v. Northside Realty Assoc., Inc.*, 380 S.E.2d

744, 745 (1979)).

Adams points to a number of provisions in the agreement, contending that they

"spell[] out [the] overwhelming control by Allstate that permeates the agency operation."

(Doc. 49 at 16-17.)  Several of those provisions actually support independent contractor

status.  For example, Adams notes that Allstate pays commissions, "which will be paid 'at

the time and in the manner' set forth in Allstate's Supplement."  (Doc. 49 at 23.)

However, the fact that Adams earned commissions "lends further support to the

conclusion that he was an independent contractor." *See Weary v. Cochrane*, 377 F.3d 522

(6th Cir. 2004).  Adams also notes that Allstate reserves the right to terminate the agent

with cause, (doc. 49 at 24), but fails to mention that Allstate or the agent can also end the

relationship without cause, another fact that weighs in favor of independent contractor

status.  *See Cobb*, 673 F.2d at 340.

Several other provisions cited by Adams have no significant bearing on the inquiry into whether he is an independent contractor.  The court in *Lockett* noted that "even in an independent contractor relationship the parties would be bound to the working relationship by a contract, such as the agreement in this case."  In other words, not every requirement of a contract indicates employer status.  For example, the Agreement may require the agent to "remain actively involved in the conduct of business," (doc. 49 at 23), but the more significant provision when considering the hiring party's "right to control" is that the Agreement allows the agent "sole and exclusive control" over all matters pertaining to employees.  (Doc. 60, Ex. 6, part III.)

Furthermore, the fact that Allstate owns the agency's telephone numbers and provides signs, manuals and other materials does not create an issue of fact considering the fact that Adams owns the place of business and all of the equipment.  *See Lockett*, 364 F.Supp.2d at 1375 ("even though Defendant owns the phone number used by the agency and provides some promotional and office materials, Plaintiff is responsible for providing the office space, equipment, products, and staff that maintain the agency").

Although Adams points to several provisions that suggest employee status, in light of the overwhelming evidence indicating independent contractor status, Adams does not raise a genuine issue of material fact, especially when one considers that the Agreement clearly denominates the Adams Agency as an independent contractor.  *See id.*; *Johns*, 927

17

F.2d at 556.

### C.  Economic Realities

Courts also consider the economic realities of the hired party's relationship with the hiring party.  *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488 (11th Cir. 1993).  "This does not mean, however, that the economic realities with respect to the dependence of the individual on the employment will control."  *Id.* at 1495.  "Rather, it is the economic realities of the relationship viewed in light of the common law principles of agency and the right of the employer to control the employee that are determinative."  *Id.*

Adams and Allstate's economic relationship is based on a commission agreement. Adams's payment is conditioned entirely on his productivity as an agent.  Because payment by commission signals independent contractor status, the economic realities lend further support to the conclusion that Adams is an independent contractor.  *See Lockett*, 364 F.Supp.2d at 1379 (citing *Sica*, 756 F.Supp. at 542); *Birchem*, 116 F.3d at 313; *John Cooper Produce, Inc. v. Paxton National Insurance Co.*, 774 F.2d 433 (11th Cir. 1985); *Weary*, 377 F.3d at 527.

The common law factors, the "right to control," and the "economic realities" all clearly indicate that Adams is an independent contractor.  Consequently, he is not entitled to protection under the AADEA, and summary judgment is due to be granted.

### II.  Allstate is Entitled to Summary Judgment on Plaintiff's Intentional Interference with Business Relations Claim Because Allstate Was Not a "Stranger" to the Contract

In order to establish a claim for interference with business relations, a plaintiff must prove:

> 1) the existence of a contract or business relation; 2) the defendant's knowledge of the contract or business relation; 3) intentional interference by the defendant with the contract or business relation; 4) the absence of justification for the defendant's interference; and 5) damage to the plaintiff as a result of the interference.

*Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So.2d 1143 (Ala. 2003) (quoting *Ex parte Awtrey Realty Co.*, 827 So.2d 104, 108-09 (Ala.2001) (quoting *Soap Co. v. Ecolab, Inc.*, 646 So.2d 1366, 1371 (Ala.1994))).  "After proving the existence of a contract, it is essential to a claim of tortious interference with contractual relations that the plaintiff establish that the defendant is a 'third party,' i.e., a 'stranger' to the contract with which the defendant allegedly interfered."  *Id.*  "This is so, because 'a party to a contract cannot, as a matter of law, be liable for tortious interference with the contract.'"  *Id.* (quoting *Lolley v. Howell*, 504 So.2d 253, 255 (Ala.1987)).

In the present case, Adams alleges that Allstate interfered with the business relations between Adams and the Hunter Agency by refusing to approve the Adams Agency's purchase of the economic interest in the Hunter Agency.  (Doc. 49 at 30.)  However, under the Hunter Agency's R3001 Agreement with Allstate, Allstate held the express contractual right to approve or disapprove the sale of the economic interest in the Hunter Agency.  (Doc. 46, Ex. A.6, part XVI.A.)  Alabama law is clear that a defendant is not a stranger to a contract where contract performance requires the defendant's approval.

19

*See Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc.*, 611 So.2d 238, 247

(Ala.1992); *Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So.2d 1143,

1155-56 (Ala. 2003); *Colonial Bank v. Patterson*, 788 So.2d 134 (Ala. 2000).

Consequently, as a matter of law, Allstate did not interfere with Adams's business

relations, and summary judgment is due to be granted.

**III.  Plaintiff Cannot Sue for Breach of Contract Because He Was Not a Party to the R3001C Agreement Between Allstate and the Adams Agency**

Defendant argues that Adams does not have standing because he is not a party to

the R3001C Agreement.  (Doc. 45.)  Adams does not dispute that the contract under

which he purports to sue is between Allstate and the Adams Agency, Inc.  (Doc. 49 at 21.)

Instead, Adams argues that Rule 17(a), the "real party in interest rule," allows him to be

the plaintiff.  (*Id.*)

The issue is whether Adams can bring a claim for breach of contract when he is

not a party to the contract, and has not argued that he is a third party beneficiary.  "It is

well-settled law that one not a party to, or in privity with a contract, cannot sue for its

breach." *Dunning v. New England Life Ins. Co.*, 890 So.2d 92, 97 (Ala. 2003).  This

principle applies despite the fact that Adams is the sole owner of the Adams Agency.  *See*

*Russell v. Birmingham Oxygen Service, Inc.*, 408 So.2d 90, 93 (Ala. 1981) (contention

that "it makes no difference" who "enforces the non-competition agreement" since the

same individual "own[ed] both corporations" was "without merit" since "[a] corporation,

just like an individual, must enforce its own rights and privileges"); *Abel v. Drayton*

20

*Flying Service*, 248 F.2d 713, 716 (5th Cir. 1957) (majority owner of the corporation was not a proper party plaintiff when the promise to pay "ran to the corporation alone"). Therefore, Adams, as an individual, cannot sue on the contract between the Adams Agency and Allstate.

Amending the complaint to add the Adams Agency would be futile because the Adams Agency cannot establish a claim for breach of contract. Adams argues that, while Allstate has sole discretion under the contract to approve or disapprove a purchase of a book of business, "Allstate's true reason for refusing the purchase – Adam's age – is not a legitimate exercise of discretion under the contract and does not comport with the covenant of good faith and fair dealing that is part of every contract." (Doc. 49 at 22.) However, Adams's argument relies on a misreading of the contract.

The R3001C Agreement between the Adams Agency and Allstate does not create a right to purchase an interest.  It creates a right to sell an interest upon obtaining Allstate's approval.  Section XVI of the R3001C Agreement governs transfers of interest.  It reads in pertinent part:

> A.  Agency may not execute a transfer of its interest in this Agreement without the prior written approval of the Company. Neither Agency, nor any shareholder or member of Agency, shall transfer any shares or interest in Agency . . . without the prior written approval of the Company. . . .
>
> B.  Subject to the terms and conditions set forth in this Agreement and the incorporated Supplement and EA Manual, Agency may transfer its entire economic interest in the business written under this Agreement upon termination of this Agreement by selling

> the economic interest in the business to an approved buyer.  The
> Company retains the right in its exclusive judgment to approve or
> disapprove such a transfer. . . .

(Doc. 50, Ex. 1, ¶XVI.)  The language "*Agency* may . . . *transfer its* entire economic

interest" clearly creates a right to *sell* an interest upon obtaining Allstate's approval.

However, nowhere does the contract provide a right to buy an interest.  The Adams

Agency attempted to buy the Hunter Agency's interest, not sell its own.  Therefore,

Allstate did not in any way breach its agreement with the Adams Agency by refusing to

allow another agency to sell the Adams Agency its book of business.

## IV.  Allstate is Entitled to Summary Judgment on the Conspiracy Claim

Allstate is entitled to summary judgment on plaintiff's conspiracy claim for two

reasons.  First, there was no multiplicity of actors.  Second, there was no underlying illegal

act.

"The intracorporate conspiracy doctrine holds that acts of corporate agents are

attributed to the corporation itself, thereby negating the multiplicity of actors necessary for

the formation of a conspiracy."  *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031

(11th Cir. 2000).  "Simply put, under the doctrine, a corporation cannot conspire with its

employees, and its employees, when acting in the scope of their employment, cannot

conspire among themselves."  *Id.*  In the present case, Adams has named only Allstate and

its employees as co-conspirators.  Consequently, under the intracorporate conspiracy

doctrine, Adams's conspiracy claim fails as a matter of law.

Furthermore, a plaintiff alleging a conspiracy must have a valid underlying cause of action.  *Callens v. Jefferson County Nursing Home*, 769 So.2d 273 (Ala. 2000).  "[A] conspiracy claim must fail if the underlying act itself would not support an action."  *Triple J Cattle, Inc. v. Chambers*, 621 So.2d 1221, 1225 (Ala.1993).  Because Adams has no underlying cause of action, Allstate is entitled to summary judgment on the conspiracy claim.

## CONCLUSION

Therefore, upon careful review of the record and the arguments presented in the briefs of the parties, the court concludes that there are no material facts in dispute and defendant is entitled to judgment as a matter of law.  An order granting defendant's motion for summary judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this the 30th day of January, 2007.


*Sharon Lovelace Blackburn*
SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE